## THOMAS M. BRASWELL, et al., INTERPLEADED WITH CHARLES C. DOWNS, et al.

1. The *acceptance* of a trust by the trustee named in the deed, is not essential to its validity.

2. The mere *possession* of slaves by the *cestui que trust*, if consistent with the objects of the trust, is no evidence of the *merger* of the equitable estate.

3. Where a life estate in slaves is given to one and remainder to her children, naming them, with a proviso that if one of the remainder men should die before the life-tenant, her children should be substituted in her place: Held that the limitation over is not too remote, but comes fully within the established rule.

4. Full faith and credit is to be given to the judgments and decrees of the Courts of a sister State of the Confederacy; but they are examinable to see whether or not the parties were properly before the Court rendering the judgment or decree, and whether the subject-matter was within its jurisdiction.

5. A statutory guardian has no authority to compromit the estate of his ward by becoming a party to a consent decree.

This case was decided at Tallahassee.

A statement of the case is contained in the opinion of the Court.

*C. G. Fife* for Appellants.

*Spencer* and *Fleming* for Appellee.

DUPONT, C. J., delivered the opinion of the Court.

The controversy between the parties to this suit has arisen out of the following deed of trust, executed by Mrs. Mary Ann Parland, for the use and benefit of her daughter, Mrs. Louisa C. Cooper and her children, to wit:

STATE OF GEORGIA, }
   GLYNN COUNTY.     }

This indenture made this fifteenth day of May, in the year of our Lord, eighteen hundred and thirty-eight, between Mrs. Mary Ann Parland, of the county and State aforesaid, of the one part, and William King of the county of McIntosh and State aforesaid, and Dr. Benjamin King of Liberty county and State aforesaid, trustees for Louisa C. Cooper and her children Mary E., William R., Martha M. and Joseph S. Cooper, all of the State and county aforesaid, of the second part: Witnesseth, that the said Mary Ann Parland of the first part, for and in consideration of the love, good will and affection which she bears towards Mrs. Louisa C. Cooper, of said county, and her children, Mary E., William R., Martha M. and Joseph S. Cooper, and also ten dollars to said Mary Ann Parland in hand paid by the same William and Benjamin King, trustees as aforesaid, the receipt whereof she doth hereby acknowledge, hath granted, bargained and sold and delivered, and by these presents, grant, bargain, sell and deliver unto the said William and Benjamin King, and to the survivor and survivors, and to their and his executors, administrators and assigns, the following slaves, thirthirteen in number, (viz:) Brutus, about 39 years of age;

John 30; Charlotte 34; Amy 10; Adam and Eve, 4 years each; Precilla 2; Linda 30; Chloe 12; Emeline 3, and Keziah 2 years of age; Louisa 8 months, and Minta 4 mos; To have and to hold said slaves, with the future issue and increase of the females, unto the said William and Benjamin King and to the survivor and survivors of them, and to their and his executors, administrators and assigns forever: Upon the trust, nevertheless, and to and for the uses, and by and under and subject to all and every the powers, provisions and limitations, hereinafter expressed and declared, that is to say, to have and to hold the same, to and for the use of the said Louisa C. Cooper, for and during the natural life of the said Louisa C. Cooper and her children above named, free and discharged from the charges, debts and incumbrances, and disposition of her late husband, C. C. Cooper, or any other husband she may hereafter marry; and from and after her death, then to and for the use of her said children, viz: Mary E., William R., Martha M. and Joseph S. Cooper, to them, their executors, administrators and assigns, living at the time of her death, share and share alike; the children of a child of the said Louisa C. Cooper and C. C. Cooper, her former husband, dying before the said L. C. Cooper to take the share or portion which they or its parent would have done if living; and if there be but one child living of the said Louisa C. Cooper by the said C. C. Cooper, her former husband, at the time of her death, then the whole to that child. But in case the said L. C. Cooper shall depart this life without leaving issue of her body by her late husband, C. C. Cooper, at the time of her death, then immediately, upon the death of the said L. C. Cooper without such issue living, to have and to hold the same to and for the use of the said L. C. Cooper, her heirs, executors, administrators and assigns for ever. In witness," &c.

Upon the execution of this deed, the slaves therein conveyed went immediately into the possession of Mrs. Louisa

C. Cooper, the life-tenant, and so continued until sometime after, when she gave a portion of them to her daughter, Mary E., who had intermarried with Robert R. Downs, and received from her and her husband a written instrument, purporting to be a release of any further interest in the life estate of the said Louisa C. Cooper.

It is also made to appear that Mrs. Louisa C. Cooper made disposition of another portion of the slaves to her daughter Martha M., who afterwards intermarried with Dr. Jesse M. Valentine, (under whom the complainants in the original bill claim as next of kin,) and at the same time executed to her a deed in writing, conveying "all her right, title, interest and claim, demand in law and equity."

The record further discloses, that Mrs. Louisa C. Cooper, the life-tenant, survived all of her children named in the trust deed, and that the complainants in the cross bill are the children of her daughter, Mary E. It is also made to appear that after the decease of Louisa C. Cooper, James H. Downs, the brother of the husband of Mary E., who had also deceased, became the administrator on the estates of Louisa C. Cooper, Joseph S. Cooper and Robert R. Downs, and also guardian of the minor children of Robert R. Downs, by his wife Mary E., the complainants in the cross bill. That as such administrator and guardian, he entered into a a written agreement with Jesse M. Valentine, the surviving husband of Martha M., by which it was proposed to compromise and settle all rights of property arising out of the original deed of trust from Mrs. Mary Ann Parland, and by which agreement it was stipulated that the title to the slaves which had been allotted to the wife of Jesse M. Valentine by her mother, Mrs. L. C. Cooper, should be confirmed to him, the said Jesse M., and with a view to consummate this agreement, a decree in Chancery was, by consent, procured to be enrolled in the Superior Court of Glynn county, in the

State of Georgia, which decree is in the following words, to wit:

" IN CHAMBERS :

" Jesse M. Valentine,        ⎫
         vs.            ⎪
James H. Downs, adm'r of Louisa C., Joseph ⎪
S. Cooper and Robert R. Downs, and guard'n ⎬  In Equity.
of William, Charles C., Joseph S., Louisa W. ⎪
and Mary E. Downs.              ⎭

" It appearing to the court that all the parties in interest are represented as consenting, and that there is no fact in dispute: It is ordered and decreed by the court, that the agreement in the pleadings mentioned, made the 9th day of April, 1855, annexed to the petition, marked C, be specifically performed and carried into execution, and that the following negro slaves, to wit: Amy, Linda, Elizabeth, Precilla, Peter, Agnes and Thomas, with the future increase of the females, are adjudged and decreed to the plaintiff, Dr. Jesse M. Valentine, his heirs, executors, administrators and assigns, for ever; and that all the estate, property and effects which were of Louisa C. Cooper and Joseph Styles Cooper, at the time of their decease, are adjudged and decreed to Louisa W. Downs and others; and James H. Downs to receive the same."

Upon this state of the case, the counsel for the complainants in the original bill assumes the following positions, viz:

1st. That the purpose in the deed from Mrs. Parland to create a *trust* failed: First, because there is no evinence that the trust was accepted by the trustees named, and secondly, becouse the possession of the property by the *cestui que trust*, was a merger of the equitable estate.

2d. That the limitation over in the deed of Mrs. Parland was an attempt to create an *estate tail*, contrary to the law both of Georgia and Florida.

3d. That Downs and wife had released all actions and claims during their lives, in regard to the same property.

4th. That the sale by Mrs. Cooper to her daughter, Martha M., gave a good title to her husband, Jesse M. Valentine.

5th. That the title to the property had been settled by the decree of the Court of Chancery in Georgia.

In suport of the first branch of the first general position, the counsel cited the §2316th of the Georgia Code, which is as follows, viz : " The acceptance of a trust is necessary to constitute a person a trustee. It may be done by acts as well as words." This is but the legislative enactment of a well established principle of the common law, but fails to sustain the position assumed by the counsel. That position, as understood at the hearing, was that the acceptance of the person named as trustee was necessary to the consummation of the trust. Such is not the law as laid down in the books. A trust will never be permitted to fail for the want of a trustee. If the person named in the deed as trustee disclaims or refuses to accept the trust, the Court of Chancery will, upon application, appoint a trustee. The citation from the Georgia Code was not designed to affect the validity of the trust, but simply to protect the person who might be named in the deed as trustee against responsibilities which he might be unwilling to assume.

The second branch of the same position is equally untenble. The proposition contended for is, that the possession of the slaves by Mrs. Louisa C. Cooper, was evidence that the legal title had passed to her, and the equitable title being thereby merged, she became the absolute owner, and possessed of full authority to dispose of the property as she might desire. However true it may be, that the possession of the property will in some cases be deemed to afford evidence of the vesting of the legal estate, as in the case of a bequest, or gift of money, stocks, &c., yet it is not correct as a general principle that the possession carries the legal estate. To determine that question, it is necessary to look as well to

the conditions of the trust, as to the nature of the property to be enjoyed. In the case of slaves, as in the case before us, the possession is essentially necessary in order to the enjoyment of the full benefit to be derived from the use of the property conveyed. In no other way could this description of property be made so beneficial to the objects of the grantee's favor, and it certainly comports much better with the enlightened and humane spirit which characterizes the public sentiment of the citizens of the Confederate States, in regard to the institution of slavery as it exists amongst us, that they should go into the possession of those who are to be presumed to have an interest in their well-being, rather than to be hired out for a long series of years and be subjected to the neglect and inhumanity of *quasi* masters, and be deprived of the highly prized comforts of a permanent home. But we are not without authority upon the point under consideration. It is announced as law in Wynn vs. Lee, (5 Geo. Repts. 217,) that "the mere possession of personal property by the *cestui que trust* does not amount to an execution of the trust, especially if the interests of *remaindermen* are effected." That is the very case presented in this suit. Mrs. Parland the grantee in the deed, settled upon her daughter Mrs. Louisa C. Cooper, amongst other slaves, those in controversy in this suit, to be enjoyed by her for the term of her natural life, with remainder over to all of her children by name and then in being, with the proviso that should one of the grand children die in the lifetime of the life-tenant, the children then in being should stand as remaindermen in the attitude of the deceased parent. The children who are seeking the assertion of their rights through this suit, are in the precise category contemplated by the proviso in the deed —they are the children of Mary E. Downs, who died anterior to the decease of the life-tenant. Will the mere possession of the life-tenant, who, under the deed, was made a *cestui que trust*, be permitted so to operate as to divest these

children of the bounty so prophetically provided for them by their great-grandmother? We think not.

But to demonstrate beyond all question how very untenable is the conclusion arrived at by the counsel for the complainants in the original bill, viz : that the possession of the property by the *cestui que trust*, operated in law as a *merger* of the equitable estate and gave to her both estates ; we may admit the proposition, and then what would be the result? Certainly not as contended for by the counsel, the investing her with an absolute unrestricted title, which would give her the right so to deal with the property as to defeat the interests of the remaindermen. She would still hold an estate *limited* in duration to her natural life, and the remainders would still stand in full force, unaffected by the assumed merger of the equitable estate. Indeed so far as the design was to convey the interest in the slaves to the life-tenant and the remaindermen, there was no necessity in law to interpose a trustee. The conveyance might have been made immediately to the life-tenant. The interposition of a trustee was doubtless designed for the benefit of the life-tenant and to secure to her the enjoyment of the limited estate, free from responsibility for the debts and demands existing against the estate of her deceased husband.

The whole doctrine upon the question of possession may be embraced in a few words. If from the nature of the property conveyed, and the use to be enjoyed, the possession of the *cestui que trust* is consistent with the object and design of the trust, the title of the trustee will not be affected. Hill on Trustees 376–7 ; Henson vs. Kinnaird, 3 Strobh. 371.

If we are correct in these views, they afford a full answer to the 3d and 4th grounds upon which the complainants in the original bill seek to establish a claim to the slaves in controversy, viz : the *release* of Downs and wife and the *sale* of the slaves by the life-tenant to Mrs. Valentine. It is a

well settled principle of law, that the trustee of settled prop-
erty holds as much for the protection and benefit of those
entitled *in remainder*, as of those to whom the immediate
beneficial enjoyment is given. Hill on Trustees, 384, margin.
Blackstone, in treating on the various modes in which con-
gent remainders may be defeated, says, "In these cases
therefore it is necessary to have trustees appointed to pre-
serve the contingent remainders, in whom there is vested an
estate in remainder for the life of the tenant for life, to com-
mence when his estate determines. If therefore his estate
for life determines otherwise than by his death, the estate of
the trustees, for the residue of his natural life, will then
take effect, and become a particular estate in possession, suf-
ficient to support the remainders depending in contingency."
2 Black. Com. 171.

The interests of these remaindermen being protected by the
estate of the trustees, it is clear that neither the *sale* by the
life-tenant to the wife of Valentine, nor the *release* of their
mother, (in whose place they are substituted by the terms of
the deed) can operate to defeat or even impair the rights of
these children. All such dealing between the life-tenant
and the particular remaindermen, can only be looked upon
as effecting the present *use* and not the ultimate estate in the
slaves.

The second ground taken by the counsel for the complain-
ants is that the limitation over to these children was an at-
tempt to create an estate tail or *perpetuity* and therefore
void. We are unable to appreciate the argument of the
counsel on this point, for to our mind we have never seen a
deed the terms of which steer more clearly against such an
interpretation. In this deed the remaindermen are all
named and required to be *in being* at the termination of the
life estate. Such was the position of these children, and the
fact that they were permitted by the terms of the deed to be
*substituted* in the place of their mother, who died prior to

the termination of the life-estate, is no objection to its validity. By the terms of the deed, the limitation to these children, (by *substitution*,) required that they should be in being at the termination of the life-estate, and fully meets the requirements of the law on this subject.

The last position assumed by the counsel for the complainants in the original bill is, that the children in this suit are estopped by the decree of the court of Chancery in Georgia from asserting any right to the property in controversy. It is undoubtedly true that both by the law of comity and by the constitution of the Confederate States, full faith and credit will be given to the judgments and decrees rendered in the courts of a sister State, nor will they be enquired into (unless in cases of fraud,) further than to ascertain whether or not the parties were properly before the court, and the subject-matter within its jurisdiction.

To this extent it is admissible for this court to go, and looking to the decree presented in the record, we find that the minor children, who are the contestants in this suit, were not properly represented. It is true that the statutory guardian of the minors is represented as having been a defendant to the suit upon which the decree was rendered, and as consenting to the decree; but we hold that upon the well understood doctrine, defining the authority of a statutory guardian, he is not competent to compromise the estate of his ward, by becoming a party to a consent decree. If the plaintiff in that suit desired to assert his rights against these minors, he ought to have had them regularly served with process, and have applied to the court to have had a guardian *ad litem* appointed to defend their rights. It would be extending the authority of the guardian to a dangerous extent, to permit him to compromise away the estate of his ward, by simply making himself a party to the suit; and no stronger instance of this danger can be imagined than that presented by the circumstances of this case. In the absence of any direct ·

authority upon the subject, such seems to be the restriction upon the authority of the guardian in the State of Georgia where this decree was rendered; for we find it laid down in the Code of that State that "the guardian cannot borrow money and bind his ward therefor; nor can he by any contract other than those specially allowed by law, bind his ward's property, or create any lien thereon." See Code, § 1788.

Chancellor Kent says, " the law is so careful of the rights of infants that if they be made defendants at the suit of creditors, the answer of the guardian *ad litem* does not bind or conclude them. Such an answer *pro forma* leaves the plaintiff to prove his case and throws the infant upon the protection of the court." 2 Kent. Com. 258. Indeed infants have ever been esteemed the special favorites of a court of Chancery, and while those courts will be careful not to disturb rights which have been once properly settled, they will exert the utmost vigilance to see that the rights of so unprotected a class are not infringed or destroyed by the officious intermeddling of a stranger. Whoever undertakes to deal with the property of an infant, must understand that he does so at his peril, and that his acts are always open to the rigid scrutiny of the courts of equity.

Upon a full and careful investigation of this case, the court is of opinion that there is no error in the decree of the Chancellor, but because there is no provision made in the decree for the ascertainment and payment of the hires of the slaves accruing since the title became vested in these minors, the cause will be remanded to the court below for correction in that matter.

It is therefore ordered, adjudged and decreed that the decree of the Chancellor be affirmed, and that the cause be remanded for such further proceedings to be had therein as shall be in conformity with this opinion.

It is further ordered that the appellants do pay the costs of this appeal.